Slip Op. 16 -110

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| CLEARON CORP., and<br>OCCIDENTAL CHEMICAL CORP., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Before: R. Kenton Musgrave, Senior Judge |
| | : | |
| UNITED STATES, | : | Consol. Court No. 13-00073 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| ARCH CHEMICALS, INC.,  and<br>HEBEI JIHENG CHEMICAL CO., LTD., | : | |
| | : | |
| Defendant-Intervenors, | : | |
| | : | |
| and | : | |
| | : | |
| JUANCHENG KANGTAI CHEMICAL<br>CO., LTD., | : | |
| | : | |
| Defendant-Intervenor. | : | |

## OPINION

[Sustaining second results of remand of sixth (2010-2011) administrative review of antidumping duty order on chlorinated isocyanurates from the People's Republic of China.]

Decided:  November 23, 2016

*James R. Cannon, Jr.* and *Ulrika K. Swanson*, Cassidy Levy Kent (USA) LLP, of Washington, DC, for the plaintiffs.

*Emma E. Bond*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant.  On the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M.*

*McCarthy*, Assistant Director.  Of counsel on the brief was *David Richardson*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington DC.

    *Gregory S. Menegaz*, *J. Kevin Horgan*, and *Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, DC, for the defendant-intervenor Juancheng Kangtai Chemical Co., Ltd.

    *Peggy A. Clarke*, Law Offices of Peggy A. Clarke, of Washington, DC, for the defendant-intervenors Hebei Jiheng Chemical Co., Ltd. and Arch Chemical Co., Ltd.

    Musgrave, Senior Judge:  This opinion concerns the second redetermination ("*RR2*")[1] on the sixth (2010-2011) administrative review of chlorinated isocyanurates ("chlor-isos") from the People's Republic of China ("PRC") and will presume familiarity with the prior opinions on the matter.[2]  The first opinion approved certain aspects of the methodology utilized by the defendant's International Trade Administration of the U.S. Department of Commerce ("Commerce" or "Department") but remanded for surrogate valuation of the normal value of subject merchandise, and the second remand was necessary for reconsideration, in relevant part, of Commerce's (1) selection of surrogate values for hydrogen gas and chlorine, (2) selection of the Philippines as the primary surrogate country; (3) selection of import data to value urea, (4) adjustment to the selling, general, and administrative (SG&A) expenses; and (5) methodology for calculating the by-product offset. *Clearon II*.  On second remand, Commerce continues to find that the subject merchandise sales of Juangcheng Kangtai Chemical Co. Ltd. ("Kangtai"), and Hebei Jiheng Chemical Co., Ltd. ("Jiheng")

---

[1] *Final Results of Second Redetermination Pursuant to Court Remand*, ECF No. 106-1 (Mar. 22, 2016).

[2] *See Clearon Corp. v. United States*, 39 CIT ___, Slip Op. 15-91 (Aug. 20, 2015) ("*Clearon II*") (remanding first remand results); *Clearon Corp. v. United States*, 38 CIT ___, Slip Op. 14-88 (July 24, 2014)  ("*Clearon I*") (remanding original "final" results).  Herein, this court's preferred abbreviation of public and confidential documents in the administrative record (*i.e*, PDoc and CDoc), are preceded by "R-" whenever referring to documents in the remand administrative record.

were made for less than normal value ("NV") during the review period, *i.e.*, June 1, 2010 to May 31,

2011 ("POR").  *RR2* at 1.  The defendant-intervenors, Arch Chemicals, Inc. and Jiheng (together

"Arch-Jiheng") and Kangtai, argue for further remand.  The plaintiffs, Clearon Corp. and Occidental

Chemical Corp. (together, "Clearon"), argue for sustaining the remand results, as does the defendant.

For the following reasons, the second remand results will be sustained.

*Discussion*

I.  Surrogate Values for Hydrogen Gas and Chlorine

In the second remand results, Commerce continued to use the Philippines as the

primary surrogate country, but given (1) a record of  a "relatively small quantity" of hydrogen gas

and chlorine imported into the Philippines during the POR, (2) prior reviews having found that those

chemicals in particular are costly to transport over long distances, thus "greatly" adding to the cost

of the inputs, and (3) no evidence on the record of this review to indicate that the nature of

transporting these two inputs had changed from the previous review, Commerce selected Indian

domestic data pertaining to Indian producers of hydrogen gas and chlorine as "[t]he only remaining

source of evidence available on the record" to value those inputs.  *Id*. at 21-23; *see also* PDoc 104

at 4 & n.10.  Clearon's comments support Commerce's redetermination on this issue.

Arch-Jiheng attempts a number of different avenues to argue that Commerce's

determination is not supported by substantial evidence on the record: (1) Commerce's  general

preference for domestic prices applies only to pricing in the primary surrogate country, (2) there is

no record evidence showing that hydrogen import data is unreliable, (3) the petitioners never raised

the issue of hydrogen transportation costs in the instant review, (4), despite Commerce's exhaustion

argument, Arch-Jiheng argues it did not fail to raise the issue of Commerce's "hazardous nature" language with respect to both hydrogen gas and chlorine, (5) Commerce has used import values for hydrogen gas in all subsequent reviews[3], (6) Jiheng's proposal to use import values is consistent with Commerce's normal practice of not adjusting surrogate values for alleged differences in shipping costs, (7) there is no record evidence showing that hydrogen is not frequently traded on an international basis, (8) using Indian data was contrary to Commerce's preferences to use contemporaneous data from a single surrogate country, (9) and Commerce has not indicated what evidence on the record of this proceeding indicates that the import values of the primary surrogate country are not reliable. Arch-Jiheng *RR2* Cmts at 21-30.

        The court finds that these arguments either (1) overlook that Commerce's preference for domestic data from the primary surrogate country assumes *ceteris paribus* and is governed by whether those data are distorted, *see*, *e.g.*, *Rhodia, Inc. v. United States*, 25 CIT 1278, 185 F. Supp. 2d 1343 (2001), which would also logically inform the choice between import data for the primary surrogate country or domestic data from a secondary surrogate country, (2) disregard the law of the case on this matter and/or incorrectly attempt to shift the burden of proof, (3) ask the court to substitute judgment for that of Commerce without persuading that Commerce's choice was unreasonable, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("a court may [not] displace the [agency]'s choice between two fairly conflicting views, even though the court would

---

    [3]   Commerce responding to this point by stating that it expressly acknowledged that possibility in the second remand results, specifically that it would reconsider the issue "in future reviews, if relevant information is placed on the record indicating that [its] prior findings regarding hydrogen and import statistics are no longer valid", *RR2* at 47; and argument continuing over the fact that final results for such reviews were, in fact, issued at the time of issuance of *RR2*.

justifiably have made a different choice had the matter been before it *de novo*"), or (4) fail to acknowledge Commerce's explicit statements on particular subject(s).  The cases to which Arch-Jiheng cites do not appear apposite to the propositions asserted, and substantial evidence of record supports Commerce's selection of surrogate values for hydrogen and chlorine gas.

## II.  Primary Surrogate Country Selection

### A.

Kangtai continues to challenge Commerce's primary surrogate country selection of the Philippines over India.  Kangtai *RR2* Cmts at 5-20.  Commerce explains that the choice was based on the Philippines being on the list of economically comparable surrogate countries at the same level of economic development as the PRC (the "OP List") while India was not.  *See generally id*. at 14-21.  The main difference on second remand is the use of Indian domestic data to value hydrogen gas and chlorine, but Commerce diminished the use of those inputs as accounting for only two of over 40 factors necessary for the production ("FOPs") of chlor-isos, depending on the producer's level of integration.  *RR2* at 15-16.

Kangtai here complains of what it considers an impossibly opaque task, of having to prove that the data for India outweigh the fact that India is not on the OP List.  *See Clearon II*, Slip Op. 15-91 at 10-11.  Specifically, Kangtai argues: (1) that the very fact that Commerce went outside the OP List for surrogate values for two important inputs shows that Kangtai met its initial burden of showing a lack of quality data for the Philippines and should have triggered a comparison of the quality of data for the Philippines against those of India on the record, and that it was improper for Commerce to avoid opining on the quality of the Indian data and instead place a greater, unspecified

burden on Kangtai as opposed to engaging in the analysis "directed by" the second remand order;

(2) that Commerce's articulated standard essentially equates "quality" as "quantity" or "availability,"

which is contrary to quality's plain meaning as "degree of excellence" or "superiority in kind", (3)

that Commerce's justification on remand is simply that as long as the Philippines has data for an

input, it is by definition of "higher quality" than the India data and Commerce need not even consider

relying on India as a surrogate source; (4) that such a standard cannot be squared with Commerce's

own policy statement discussing quantity and quality as two separate aspects of data consideration,

either of which could necessitate having to look at off-list country data;[4] (5) that Commerce

continues to conflate data quality and economic comparability notwithstanding the second remand

order's express rejection thereof and improperly burdens Kangtai with having to prove every one of

the Philippine data of less quality than the Indian data; (6) that Kangtai did address FOPs beyond

hydrogen and chlorine that were of lesser quality, including the reliability of the MVC financial

statement, concerning which Kangtai further argues Commerce misapplied the reason-to-believe-or-

suspect standard for finding distortion and that it, Kangtai, was not required to prove, nor was

Commerce required to formally investigate, the actual extent to which MVC benefitted from its

declared subsidy programs before concluding that the MVC data should be disregarded; (7) that the

very same reasons Commerce offered for choosing Indian chemical inputs over South African import

statistics in the *Preliminary Results* are true for the Philippines data as well, and with regard to the

---

[4]  *See* Policy Bulletin 04.1 ("it may happen that some countries meet both criteria, but sufficient data (with respect to quantity and quality) are not available to enable Commerce to use any of those countries as the primary surrogate."); *id*. ("a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable.").

defendant's criticism that Kangtai made no record citation to the Philippines import data to show it also does not have detailed concentration levels, Kangtai replies that "[a]ny cursory understanding of the import statistics or *Preliminary Results* or a mere glimpse of Commerce's surrogate value summary chart makes the same lack of concentration specificity abundantly clear" for the Philippine data, unlike the more specific Indian domestic data; and (8) that the defendant's claims on Kangtai's arguments (*i.e.*, on (a) conflation of the quality of data with economic comparability, (b) valuing economic comparability over significant production in violation of the statute, (c) error in determining the Philippines was a significant producer, and (d) refusal to acknowledge that India has better data than the Philippines and produces more comparable merchandise) as "beyond the scope of remand" or "previously resolved" are either incorrect, disingenuous, inconsistent, ignore *Clearon II*, or consist of a combination thereof.  "Ultimately, the United States still fails to separately consider the totality of the data quality in India compared to the Philippines separate from its improper view that the data quality in India is *per se* lower because India is less economically comparable based on per capita" gross national income ("GNI").  Kangtai *RR2* Reply at 8.

### B.

The question here, as always, is whether the second remand results are supported by substantial evidence and in accordance with law.  As previously discussed, the relevant statute, 19 U.S.C. §1677b(c)(4), at a minimum requires that the surrogate country be, to the extent possible: (A) "at a level of economic development comparable to that of the nonmarket economy country" ("NME"), and (B) a "significant producer[ ] of comparable merchandise."

      Examining Commerce's primary country surrogate selection process as a general matter, *Clearon II* acknowledged that Commerce typically selects a country from the list of countries at the same level of economic development as the home country measured by per capita GNI, and it observed that Commerce will compare data from countries on the surrogate country list with data from a "less comparable country" when it becomes persuaded that none of the listed countries provide the requisite "scope of 'quality' data." *Clearon II*, Slip Op. 15-91 at 10-11.  The opinion also observed "that Commerce's selection of the Philippines as the primary surrogate country has general support in the record", *id*. at 12, and therefore the question for remand as to whether the Indian data is in fact the "best" information available depended on "the quality of each challenged element of the Philippines data."  *Id*. at 11.  Commerce on second remand concluded from the foregoing that absent adequate showing that the Philippines lacks the quality of data necessary to complete the review, it was not required to conduct a comparison of those data with those of a country at a less comparable level of economic development. *See id.* at 10-12.  The court is unable to conclude that that is an unreasonable interpretation of *Clearon II*, and the results of the second remand comply to that extent with what was ordered.  *See RR2* at 14-21.

      Adhering to its selection of the Philippines as the primary surrogate country, Commerce explained, again, that the Philippines was on the surrogate country list and that there were quality data available for the "vast majority" of the FOPs.  As mentioned, Commerce further explained that producing chlor-isos requires over forty FOPs, depending on the level of integration, including "dozens of chemical inputs, packing materials, electricity, labor, overhead, selling, general, and administrative expenses, and profit."  *Id*. at 15.  Although Commerce had previously alluded

to the importance of hydrogen gas and chlorine, in considering the issue anew it downplayed their importance and considered that its determination to use Indian data for those inputs (hydrogen gas and chlorine) was now of lesser import when considered alongside the quality Philippine data for the remaining dozens of FOPs.[5]  *See id*. at 15.  As compelling as Kangtai's arguments may be, on Commerce's *volte-face* of the importance of those two chemicals to its choice of primary surrogate country, Commerce maintained that it preferred using the available quality of Philippine data for the remaining FOPs because the Philippines was an economically comparable country reflecting a similar "overall economic environment" as the NME, including "general labor and professional wages, interest rates, the availability of financing, [and] the sophistication of infrastructure." *Id*. at 15-16.  Here, the defendant contends that Commerce's declining to compare specific data from the Philippines with Indian data was consistent with *Clearon II* because Kangtai had failed to meet its burden of persuading that the Philippine data for the remaining FOPs were not "quality" data.  Def's Resp. to *RR2* Cmts at 11, referencing *RR2* at 15, 42.  The defendant maintains that since the Philippines provided the requisite quality data for all FOPs except hydrogen gas and chlorine, no comparison with Indian data was required. *Id*., referencing *RR2* at 42.

    Kangtai makes two arguments on Philippine data quality. First, it contends that the relevant Philippine financial statement for Mabuhay Vinyl Corporation ("MVC"), upon which Commerce relied, allegedly reflects receipt of countervailable subsidies, and it is Commerce's

---

[5] Commerce explained that "chlorine and hydrogen are not so critical as to warrant switching to India as the primary surrogate country, at the expense of quality data for all other [FOPs] chosen from a country at the same level of economic development." *Id*. at 15. That reasoning mirrors the preliminary results, in which Commerce used Indian data to value hydrogen and chlorine, but selected a primary surrogate country from the list of comparable countries. *See* PDoc 104 at 3-4.

practice "'to reject the financial statements of a company that [it has] reason to believe or suspect may have benefitted from countervailable subsidies[.]'" Kangtai *RR2* Cmts at 15, quoting *Golden Dragon Precise Copper Tube Grp. v. United States*, 39 CIT ___, ___, Slip Op. 15-89 at 10 (Aug. 19, 2015) (quoting *Chlorinated Isocyanurates From China*, 75 Fed. Reg. 70212 (Nov. 17, 2010), and accompanying issues and decision memorandum ("I&D Memo") at cmt. 3). Under this practice, Commerce excludes "financial statements that contain a subsidy that [Commerce] has found countervailable in the past." *RR2* at 43; *see also Chlorinated Isocyanurates from the PRC*, 76 Fed. Reg. 70957 (Nov. 16, 2011) and accompanying I&D Memo at cmt. 2.  Kangtai argues the relevant tax incentives reflected in the MVC financial statement "very closely match" programs that Commerce found were countervailable in 1986. Kangtai *RR2* Cmts at 16-17 (citing *Canned Tuna From the Philippines*, 51 Fed. Reg. 43758 (Dec. 4, 1986) (final results).  Kangtai points to Commerce's list of countervailable subsidy programs in the Philippines, albeit without precise argument on the potential relevancy of specific subsidy program(s). *Id.* (citation omitted).

         Commerce rejected the argument that the MVC financial statements actually reflect "countervailable" subsidies, explaining that the tax incentives cited by Kangtai "are either too vague to tie to a previously countervailed subsidy," or have not been "previously countervailed as a subsidy." *RR2* at 23-24, 43 (citations omitted).  The defendant adds that Kangtai's arguments do not show that the specific tax incentives at issue have been previously found to be countervailable and that Commerce was not required to treat them as countervailable or required to conduct a "formal" investigation into the matter.  Def's Resp. to *RR2* Cmts at 11-12, referencing *Chlorinated Isocyanurates from the PRC*, 76 Fed. Reg. 70957, and accompanying I&D Memo at cmt. 2, and

Omnibus Trade and Competitiveness Act of 1988, H.R. Rep. No. 100-576, at 590-91 (1988) (Conf.

Rep.) ("OTCA"), reprinted in 1988 U.S.C.C.A.N. 1547, 1623-24.

Kangtai is correct, however, in arguing that there is only a "reason to believe or

suspect" standard that the merchandise is subsidized, Kangtai *RR2* Cmts at 15-16, and in

emphasizing that Commerce is not required to "conduct a formal investigation to ensure that . . .

prices are not dumped or subsidized".  OTCA at 590-91.  The defendant's response, above,

exaggerates the relatively low bar of the reason-to-believe-or-suspect standard in the sense that a

finding of distortion does not depend upon the existence of a finding or determination of

countervailability.  On the other hand, Commerce must "base its decision on information generally

available to it at that time", *id*., which appears to be what Commerce has done here, because

Commerce's additional finding that MVC may not have actually received these tax subsidies has

support in the record.  *See RR2* at 43 ("Kangtai did not provide any indication from MVC's financial

statements that the company actually received any of these tax incentives").  Kangtai argues that

MVC actually received income tax holiday tax benefits of 6.95 million Philippine Pesos (PhP) in

2010 and 2.65 million PhP in 2009, Kangtai *RR2* Cmts at 16, citing PDoc 65, Exh. 4, p. 23 (MVC

Annual Report), but Commerce's position is that most of the listed subsidies are not income tax

holiday incentives, and the financial statement does not state that MVC actually received the listed

subsidies for, *e.g.*, duties on raw materials for an export product, or exemption from wharfage dues.

*See* PDoc 65, Exh. 4, p. 23.  Commerce thus declined to find that MVC actually received the specific

subsidies, and it continued to rely on the MVC financial statements as "quality" data from the

Philippines. *See RR2* at 43.  The court can not substitute its own view of the matter therefor.  *See Universal Camera*, *supra*, 340 U.S. at 488.

Continuing, Kangtai also argues that the Philippines data for four chemical inputs (calcium chloride, barium chloride, zinc sulfate, and sulfuric acid) "lack the specificity of the concentration levels." Kangtai *RR2* Cmts at 17-18.  It cites the preliminary determination, in which Commerce rejected South African import values for four FOPs because it "did not have South African import statistics by the concentration level referenced in the GTA for those factors", and it argues that the Philippine import data suffer from the same flaw  *Id*. at 17-18.  The defendant's response is that Kangtai did not raise this argument in its first motion for judgment before this court, although it raised other arguments regarding concentration of chemical inputs.[6] *See* Kangtai Rule 56.2 Mot., ECF No. 30-1, at 27-31 (Aug. 15, 2013). The defendant thus argues it is too late at this state of the proceeding to insert new issues.  Def's Resp. to *RR2* Cmts at 14, referencing *Dorbest Ltd. v. United States*, 35 CIT ___, ___, 755 F. Supp. 2d 1291, 1300 (2011) ("[r]emand proceedings do not grant the parties the right to a new antidumping investigation from the current date").

The court considers Kangtai's argument as proper elaboration on its general argument for India as the primary surrogate country and motivated by the holding of *Clearon II*.  On the other hand, Kangtai's assertion spans only two or three sentences, is without reference to the concentration levels of the specific inputs in the record, *see* Kangtai *RR2* Cmts at 17-18, and "[i]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at

---

[6]  Kangtai previously argued that Commerce had erred in using Philippine data to value sodium hydroxide because Kangtai used a lower concentration level than the commercial norm, which argument *Clearon II* concluded was unpersuasive.  Slip Op. 15-91 at 28-31.

developed argumentation, are deemed waived." *SmithKline Beecham Corp. v. Apotex Corp*., 439

F.3d 1312, 1320 (Fed. Cir. 2006), quoting *Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001).

*See also Home Prods. Int'l, Inc. v. United States*, 36 CIT ___, ___, 837 F. Supp. 2d 1294, 1301

(2012) (not the duty of a court to establish an argument's ossature).  Be that as it may, the defendant

points out that the four FOPs appear to be responsible for less than eight percent of the direct

materials, and the court agrees this is insufficient reason for holding unreasonable Commerce's

selection of the Philippines as the primary surrogate country.

## C.

With respect to Kangtai's remaining challenges to the Philippines' quality of data,

economic comparability, and the significant producer requirement, these have either been previously

resolved or they are insufficient to impact Commerce's surrogate country selection.  In brief, Kangtai

argues that Commerce "conflated quality of data with economic comparability," Kangtai 2nd

Remand Cmts at 2-3, that the statute does not value economic comparability over significant

production, *id*. at 3-5, that Commerce erred in its analysis regarding whether the Philippines is a

significant producer of comparable merchandise, *id*. at 5-13, and that India has better data than the

Philippines and produces more comparable merchandise, *id*. at 13-20.  These do not provide a basis

for holding the second remand results unsupported by substantial evidence on the record or otherwise

not in accordance with law, as, fundamentally, they argue for the court to substitute its own view of

the record, which is not appropriate where Commerce's interpretation of the record is not shown to

be unreasonable.  *See Universal Camera, supra*, 340 U.S. at 488.

Kangtai first challenges Commerce's preference for data from a country at the same level of economic development as the PRC. *See* Kangtai 2nd Remand Cmts at 2-3. Kangtai argues the second remand results' statement that "[d]ata from a less comparable country is automatically at a disadvantage to data from a country at the same level of economic development" means that Commerce "conflated quality of data with economic comparability." *Id*. at 3. Kangtai is correct (Commerce's statement does appear to conflate), but the ultimate problem was one of persuasion. *See Clearon II*, Slip Op. 15-91 at 10-11 (Commerce "acts not unreasonably in burdening the party proposing a non-listed country with demonstrating that no country on the surrogate country list provides the scope of 'quality' data that it requires in order to make a primary surrogate country selection"). In other words, Commerce expressed on second remand that it was simply not convinced that the merits of the Indian data outweighed the fact that India was not on the OP List.

Kangtai also argues Commerce improperly valued economic comparability over the separate factor requiring the surrogate country to be a significant producer of comparable merchandise. Kangtai *RR2* Cmts at 3-5. However, Commerce found that the Philippines satisfies both criteria: it is at the same level of economic development as the PRC, it is a significant producer of comparable merchandise, *e.g.*, *RR2* at 19-20, and the court previously observed that the selection of the Philippines has "general support in the record." *Clearon II*, Slip Op. 15-91 at 12. Kangtai again discusses the *Ad Hoc Shrimp Trade Action Comm'n v. United States*, 36 CIT ___, ___, 882 F. Supp. 2d 1366, 1375 (2012) and *Amanda Foods (Vietnam) Ltd. v. United States*, 33 CIT 1407, 647 F. Supp. 2d 1368 (2009) decisions to argue that neither statutory factor or the quality and availability of data discussed in Commerce's policy bulletin is preeminent, *see* Kangtai 2nd Remand Results

Cmts at 4-5, 11-13, but those (and other) cases have already been analyzed with respect to the points the plaintiff would attempt to revive here. *See Clearon I*, Slip Op. 14-88 at 25-30 (explaining that *Ad Hoc Shrimp* and *Amanda Foods* are distinguishable from this case because both involved countries on the surrogate country list). Both cases, moreover, are consistent with Commerce's approach here of "treating the per capita GNI ranking as a threshold statutory criterion that must be met before the other criteria are considered." *Id*. Kangtai's reliance on *Amanda Foods* and *Ad Hoc Shrimp* thus continues to be unpersuasive.

Additionally, Kangtai raises numerous additional arguments relating to the significant producer criterion. Kangtai *RR2* Cmts at 5-13, 18-19. For example, Kangtai disagrees with Commerce's explanation regarding the relationship between economic comparability and significant production; to wit, that Commerce "considers these two statutory factors (economic comparability and significant production) to be independent of each other" and that "both factors are threshold" requirements. *RR2* at 20. Kangtai disagrees, arguing that Commerce "cannot lawfully make one criterion a threshold requirement to the exclusion of the others." Kangtai *RR2* Cmts at 8-9. As these are both *statutory* criteria, and the court has already considered and rejected similar argument, more need not be said. *See, e.g.*, *Clearon I*, Slip Op. 14-88 at 24-25, *Clearon II*, Slip Op 15-91 at 8 & n.7. Commerce requires both economic comparability and significant producer status, to the extent possible, and does not elevate the former criterion "to the exclusion of the others." *See* Kangtai *RR2* Cmts at 8-9; *RR2* at 20. Commerce's interpretation is thus consistent with the statute's plain language. *See* 19 U.S.C. §1677b(c)(4).

Commerce further explained in the second remand results that the significant producer factor is based on "evidence of actual production of comparable merchandise, even though it may be on a much smaller scale than that of the respondents or the NME under investigation." *RR2* at 20.   Kangtai disagrees, relying on *Fresh Garlic Producers* to argue that significance is "a term of comparison" requiring reference to world trade.   Kangtai *RR2* Cmts 6, referencing *Fresh Garlic Producers Association v. United States*, 39 CIT ___, ___, 121 F. Supp. 3d 1313, 1338 (2015).   Nonetheless, Commerce's interpretation of "significant" is entitled to *Chevron* deference, and it also appears to be consistent with the court's analysis in *Fresh Garlic Producers* that production may be significant when it affects world trade in any event. *See Fresh Garlic Producers*, 121 F. Supp. 3d at 1337-38.   Kangtai does not point to record evidence that, or explain why, the Philippines' production of the comparable merchandise, sodium hypochlorite, was so low that it completely failed to affect world trade, and contrary to Kangtai's argument (*see* Kangtai *RR2* Cmts at 7), Commerce's interpretation does not equate significant production with "any" production.   *See* Import Administration Policy Bulletin 04.1 (the significant producer analysis strives for consistency with "the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics)" but "should not be judged against the NME country's production level").   Commerce's reasoning is consistent with the Policy Bulletin and is not synonymous with "any" production. *See RR2* at 19-20.

Kangtai also cites to Commerce's determination on a certain frozen fish fillets as precedent for comparing data from a country on the surrogate country list with data from an off-list country. Kangtai *RR2* Cmts at 11, referencing *Certain Frozen Fish Fillets From the Socialist*

*Republic of Vietnam,* 79 Fed. Reg. 19053 (Apr. 7, 2014) (final results).  But that determination did

not state that Commerce was departing from its general policy of treating economic comparability

and significant producer as threshold requirements "to the extent possible" consistent with 19 U.S.C.

§1677b(c)(4).   Rather, the determination involved a "unique industry" for producers of live

pangasius fish consisting of only a "limited number of significant producers" worldwide. *Certain*

*Frozen Fish Fillets from the Democratic Republic of Vietnam*, 78 Fed. Reg. 55676 (Sep. 11, 2013)

(preliminary results), and accompanying preliminary decision memorandum at 17.  In other words,

the facts of  *Frozen Fish Fillets* are not quite analogous to those considered in the second remand

results.

Kangtai next argues that India has better data than the Philippines and produces more

comparable merchandise.  Kangtai *RR2* Cmts at 13-20.  These arguments either attempt re-litigation

of issues already decided, or they are immaterial to the remaining issues, or they essentially call for

supplanting Commerce's interpretation of the record and its statutory duties without persuading that

Commerce's interpretation was unreasonable.  Of course in the case of the latter, for the court to so

order would run afoul of the standard of review.  *See Universal Camera*, *supra*, 340 U.S. at 488.

Kangtai also challenges Commerce's explanation that, all else being equal,

Commerce will consider data quality as a "'tie breaker'" in choosing between multiple countries on

the OP List that are significant producers of subject merchandise.  *See* Kangtai *RR2* Cmts at 13,

quoting *RR2* at 41. Kangtai disagrees with Commerce's statement that data quality in such cases "is

more a matter of data 'quantity'" and argues that that is against Commerce policy.  *See id*.  Apart

from stating that this is a "new idea," Kangtai does not elaborate, nor does it explain why Commerce

should not receive deference on a matter that is within its expertise. *See Atar S.R.L. v. United States*, 730 F.3d 1320, 1325 (Fed. Cir. 2013).  In any event, the meaning of data quality versus quantity is not material here, because the Philippines is on the OP List and India is not, so Commerce is not "choosing between multiple countries on the surrogate value list." *RR2* at 41.

Finally, Kangtai argues that Commerce should have used Indian data because the size of India's chemical industry is more comparable to the PRC's. Kangtai Brief, at 18-20. But that does not require a different outcome. As Commerce explained, "'economic comparability' is not an industry-focused analysis." *RR2* at 16. Consistent with this court's decision sustaining Commerce's focus on GNI, the economic comparability prong is focused on the "overall economic environment," not the status of a particular industry within the economy. *See RR2* at 16; *see also Clearon I*, Slip Op. 14-88 at 22-25. The PRC, India, and the United States all have "large-scale chemical industries," yet "[t]he United States could not be considered economically comparable" to the PRC. *RR2* at 16. Focusing on a single industry would incorrectly read the "economic comparability" criterion out of the statute. *See id.*

That the PRC is an NME, moreover, means that its prices are not determined by the market forces of supply and demand. *Id.* at 17.  The size of a particular industry may result from distortions inherent in the PRC's NME, making it inappropriate to require a surrogate country with a similarly-sized industry.  *Id.*  Kangtai challenges this rationale, arguing that, if true, it would prevent Commerce from relying on GNI to determine economic comparability.  Kangtai *RR2* Cmts at 20.  But the argument misses the mark.  When considering an NME country, "Commerce presumes all respondents are government-controlled".  *Ad Hoc Shrimp Trade Action Comm. v.*

*United States*, 802 F.3d 1339, 1353 (Fed. Cir. 2015) (citing *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997)).  Under that presumption, an industry may increase in size because the NME government is directing resources to certain favored companies in specific industries. *Cf. RR2* at 16.  But government control over a company or an industry is different from growth in the economy as a whole reflected by GNI.  For the above reasons, Kangtai's objections to Commerce's selection of the Philippines as the primary surrogate country are therefore unpersuasive at this stage.

III. Surrogate Valuation of Urea Using Indian Domestic Dealer Prices

To value the urea FOP, on remand Commerce opted for the Philippines' Bureau of Agricultural Statistics (BAS) data previously placed on the record by Clearon during the review.  The initial *Final Results* had relied on data for Philippine imports of urea from the Global Trade Atlas, although Commerce prefers domestic data over import data when selecting surrogate values.  The urea FOP was remanded due to expressed rationale that did not quite square with the record, and notwithstanding Commerce's further-expressed concern during litigation about the BAS data's market representativeness of domestic urea production in the Philippines.[7]

After further review, on second remand Commerce found the record inconclusive on the questions of whether all urea is imported or whether domestic fertilizer production includes production of urea.  *See RR2* at 12, referencing Jiheng Sep. 5, 2012, SV Submission, at Attachment 2.  On the other hand, Commerce acknowledged that in prior review(s) it had found the BAS data specific to urea, representative of a broad market-average, publically available, and tax and duty

---

[7] Commerce's final determinations must be sustained, if at all, on the basis articulated in the determination by Commerce itself.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156-168-69 (1962).

exclusive, making it reliable.  *Id*. at 13.  Commerce therefore relied on the BAS data for the present

review after noting that while the underlying data notes that fertilizer production had decreased in

the Philippines, there are no specific statistics about urea production itself or indication that the trend

is significant.  Commerce also noted that the domestic price of urea had slightly decreased from the

previous year, which was the smallest decrease compared with other fertilizers, and that other data

indicated that the import price of fertilizers is sensitive to the price of oil.  Commerce inferred from

this that changes in domestic price can be explained by changes in relevant market factors rather than

by aberrationally small domestic production and further explained that it does not take economies

of scale into consideration when choosing a surrogate value in any event.  *Id*. at 13-14.

Challenging this reasoning, Kangtai and Arch-Jiheng stress that there is no evidence

on the record of any domestic production, and that the record only supports the reasonable inference

that all urea sold in the Philippines is imported.  Arch-Jiheng, supported by Kangtai, argues that the

three quotes from the articles it provided for the record -- to wit, "92% of PHL fertilizer requirements

are imported", "In 2004, the Philippines bought an aggregate volume of 8.8M tons of various

fertilizer grades, with urea accounting for 30% and ammonium sulfate for 24%", and "Urea, potash,

and half of the ammonium sulfate are imported while all the phosphatic grades (NP/NPK) and the

rest of the ammonium sulfate are produced locally" -- only support the inference that all urea is

imported.  *E.g.*, Arch-Jiheng *RR2* Reply at 15 (citation omitted).  *See RR2* at 38-39.  In response to

such arguments during the remand, Commerce disagreed, stating:

> While these articles support the contention that urea is imported (a fact the
> Department is not contesting), they offer a somewhat vague picture of the market and
> industry specific to urea and do not state that 100 percent of urea is imported, or that
> there is no domestic production.  Without any such statements, we cannot conclude

the price represents 100 percent imports.  The Department does not as a matter of course conduct a query into whether an apparently domestic price (*e.g.*, a price published by a government agency involved in domestic policy, such as an agricultural agency) is, in fact, based on domestic market sales.  Clearly, if presented with evidence that the price was solely an import price (*e.g.*, a price published by a customs authority or a footnote indicating the price was based solely on imports), we would consider that evidence.  In this case, however, there is no such evidence.

The evidence implies that a large portion of urea is imported, but it does not preclude the possibility that urea is also domestically produced, albeit in small quantities, just as similar fertilizers are. Therefore we continue to rely on the BAS data as the SV for urea for this final remand redetermination.

*RR* at 39.  Commerce ultimately concluded it would use the BAS data because, *inter alia*, "all else being equal (public availability, contemporaneity, *etc.*), the BAS data, which represents dealer prices in the Philippines, is the preferred source over the GTA data used in the underlying review."[8]  *See RR2* at 12-13.

The court cannot fault Commerce's analysis.  Bearing in mind that "the burden of creating an adequate record lies with interested parties and not with Commerce", *Nan Ya*, 810 F.3

---

[8]  Clearon also adds that Jiheng's SPIK excerpt indicates that the fertilizer industry "has been liberalized in 1987 fostering free competition *particularly in the urea market.*" Clearon *RR2* Resp. to Cmts at 8, quoting PDoc 118 at Att. 2 (Clearon's emphasis).  The page goes on to state that (apparently in 1987) the government provided subsidies "[a]s further incentive for the local producers of fertilizers." *Id. quoting id.*  Clearon argues that "[t]his reference, therefore, does not establish that all of the urea sold in the Philippines is imported, but is reasonably understood to mean that *there is a competitive urea market in the Philippines* that includes local producers (albeit subsidized in 1987)." *Id*. (Clearon's emphasis). Clearon also notes that following the SPIK excerpt, the Attachment next includes a 2006 report by Florence Mojica-Sevilla, Senior Agribusiness Specialist, Center for Food and Agri Business, University of Asia and the Pacific, entitled "The Philippine Fertilizer Industry", and it calls attention to the report's statement that "local fertilizer plants depend partly upon the use of imported raw materials such as rock phosphate, anhydrous ammonia, and sulphuric acid." *Id.* at 9.  Clearon further argues that since ammonia is the principle raw material for the production of urea, it therefore appears from the context that urea is in fact produced by "local fertilizer plants" in the Philippines, and that this attachment thus contradicts the notion that urea is not produced in the Philippines.  *Id*.  Such points, however, go beyond what was expressed in the second remand results.

at 1338, Commerce is permitted, and indeed is often required, to draw reasonable inferences from the record. *See*, *e.g. Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Tech., Salaried, & Mach. Workers*, 6 F.3d 1511, 1520 (Fed. Cir. 1993). "The question is whether the record adequately supports the decision of [Commerce], not whether some other inference could reasonably have been drawn." *Daewoo*, 6 F.3d at 1520 (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)). Stated differently, the possibility of a different inference based on the same record does not mean that Commerce's finding is unsupported by substantial evidence. *See Swiff-Train Co. v. United States*, 793 F.3d 1355, 1367 (Fed. Cir. 2015) (citation omitted).

Kangtai, however, argues that even assuming that the 8 percent of Philippines fertilizer that is produced domestically includes urea, the domestic price is not a reliable source because a typical Philippines domestic producer of chlor-isos would actually source its urea by imports. Kangtai *RR2* Reply at 12, referencing *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT 288, 300, 366 F. Supp. 2d 1264, 1274 (2005) ("the preference for domestic data is most appropriate where the circumstances indicate that a producer in the hypothetical market would be unlikely to use an imported factor in its production process."); *Yantai Oriental Juice Co. v United States*, 26 CIT 605, 617 (2002) (rejecting import data because Commerce failed to explain why the industry would purchase more expensive imported coal over domestic coal). Nonetheless, the record evinces a "domestic market" for urea, howsoever constituted. *Cf. Sulfanilic Acid From the PRC*, 65 Fed. Reg. 13366 (Mar. 13, 2000) (final results) and accompanying I&D Memo at cmt. 2 (the decline in the import tariff "effectively removed the distortions in the domestic price that we[re] previously attributed to th[e] 'abnormally high' rate" that had precluded selection of the

domestic price in a prior review). Kangtai's arguments appear to implicate the market channels for

the distribution of inputs, concerning which the court is referred to no information of record.  *See*,

*e.g*, Kangtai *RR2* Reply at 12 ("[i]n the Philippines, a hypothetical [chlor-isos] producer would

source its urea from the abundant more reasonably price imports").

Continuing on this point, however, Arch-Jiheng argues Commerce erred in finding

that the BAS data are tax and duty exclusive. Arch-Jiheng *RR2* Cmts at 16.  But Arch-Jiheng did not,

make that argument to Commerce, and therefore the court must find that it failed to failed to exhaust

its administrative remedies in that regard.  *See McKart v. United States*, 395 U.S. 185, 193-94

(1969)*; see*, *e.g.*, *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1388 (Fed. Cir.

2014).  In its comments to Commerce, Arch-Jiheng argued only that "there is no production of urea

in the Philippines," and thus "there can be no domestic prices and [Commerce] must use the

imported values."  R-PDoc 82 at 1-5 (capitalization altered). It did not argue, as it does now, that

even if there were domestic production, "the BAS data are not 'tax and duty free[.]'" Arch-Jiheng

*RR2* Cmts at 17 (citing *RR2* at 13).   Commerce provided the opportunity for comment on its draft

remand results, noting its finding in a prior review that BAS data for urea was "exclusive of value

added taxes." R-PDoc 74, Att. at 13, quoting *Final Results of Redetermination Pursuant to Court*

*Remand*, CIT No. 08-00364, ECF No. 79, at 7-8 (Mar. 19, 2012), sustained by *Clearon Corp. v.*

*United States*, 37 CIT ___, Slip Op. 13-22 (Feb. 20, 2013) ("alt-*Clearon*").[9]  As the defendant

---

[9]  The defendant notes that in alt-*Clearon*, although Commerce ultimately selected Indian data, it did so because of its preference to use a single surrogate country, 19 C.F.R. §351.408(c)(2), and despite finding that the Philippine data "fulfilled its selection criteria." *See* alt-*Clearon*, Slip Op. 13-22 at 8-9.

argues, Arch-Jiheng submitted comments regarding urea, but did not dispute that the BAS data for

urea is tax and duty free.  *See* Remand PDoc 82 at 1-5.

That does not, of course, address whether the BAS data are *actually* import duty

exclusive, but when comparing two data sets, one from domestic sources and the other from import

sources, "the conditional preference for domestic data is a logical starting point for achieving the

objective set by Congress" because "it is reasonable to assume that a domestic price reflects the

value of a factor of production more accurately than an import price." *Hebei Metals & Minerals*

*Import & Export v United States*, 29 CIT 288, 300, 366 F. Supp. 2d 1264, 1274 (2005).  *See also*

*Taian Ziyang Food Co. v. United States*, 33 CIT 828, 890 n.61, 637 F. Supp. 2d 1093, 1148 n.61

(2009); *Home Meridian Int'l, Inc. v. United States*, 37 CIT ___, ___, 922 F. Supp. 2d 1366, 1376

(2013) ("[w]hen presented with conflicting evidence that provides substantial evidence to support

opposite conclusions, the court will defer to Commerce's reasoned choice between the two").  The

BAS data contain a domestic price that is published by a government agency involved in domestic

policy, and the record does not show that price "was solely an import price." *RR2* at 39. Commerce

retains discretion over its preferred data, and on the record here, the court cannot intrude upon

Commerce's informed determination on this issue.  *See Universal Camera*, *supra*, 340 U.S. at 488.

IV.  "As-Adjusted" Financial Ratio Calculations

In the second remand results, Commerce adjusted the selling, general, and

administrative (SG&A) ratio that it derived from the MVC financial statements in order to exclude

the production labor items included in SG&A that were already included in the International Labor

Organization (ILO) Chapter 6A surrogate value for labor.[10]  Specifically, Commerce noted that the

financial statements used in this review are consistent with the distinction between production labor

and SG&A labor, listing  "direct labor" and "supervision and indirect labor" as part of the costs of

sales associated with the production of merchandise, but separately listing "salaries and wages"

under "operating expenses", which refers to salaries and wages of non-production employees such

as administrative and managerial employees and also refers to retirement benefits and employee

benefits.  *See* Def's Resp. to *RR2* Cmts at 31, referencing PDoc 65 at Att. 4, p. 34 (bracketing

omitted).  Commerce adjusted the operating expenses of the financial statement labeled "retirement

expenses", but only to the extent that they reflected production labor, and it declined to adjust

"employee benefits" since

> nowhere in the financial statements is there any definite indication that these benefits
> apply to 'regular' employees as there is in the notes for retirement benefits.  Because
> the record provides no further details on these employee benefits, and because these
> benefits are presented on the face of the financial statements as "Operating
> Expenses," we are continuing to treat this line item as part of SG&A expenses.

---

[10]  As previously discussed, the normal value of subject merchandise in a non-market
economy is determined in part based on "the value of the factors of production utilized in producing
the merchandise", 19 U.S.C. §1677b(c)(1), including "an amount for general expenses" and "other
expenses," *id*. §1677b(c)(1), which includes labor expenses that are not related to production of the
subject merchandise.  In changing its methodology, via notice and comment, for determining the
labor FOP in a given case, Commerce now employs a rebuttable presumption that ILO Chapter 6A
data "better accounts for all direct and indirect labor costs" than Chapter 5B data, which had only
"capture[d] the pre-tax monetary remuneration received by the employee."*Antidumping
Methodologies in Proceedings Involving Non  Market Economies: Valuing the Factor of Production:
Labor*, 76 Fed. Reg. 36092, 36094 (June 21, 2011) ("*Labor Methodology*"). *See also Antidumping
Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production:
Labor; Request for Comment*, 76 Fed. Reg. 9544 (June 21, 2011) ("Chapter 5B data includes two
types of compensation: (1) [d]irect wages and salaries ('wages'), as well as (2) earnings data, which
include wages plus bonuses and gratuities ('earnings'). The Department prefers 'earnings' data, when
available, since it more accurately reflects the full remuneration received by workers.") (citation
omitted).

*RR2* at 7.  *See also id*. at 28 ("a fully loaded ILO 6A SV does not account for all labor expenses; it only accounts for all production labor expenses, because the SV is only being applied to a FOP that accounts for production labor"); *id* at 30 ("Kangtai points to no record evidence indicating that 'regular' employees apply only to production labor").  The defendant elaborates that Commerce's practice in such cases is to rely on the classification in the surrogate ratio financial statements rather than "going behind" the financial statement to determine precisely what each item includes.  *Id*., referencing *Certain Steel Threaded Rod from the PRC*, 79 Fed. Reg. 71743 (Dec. 3, 2014) (final rev. results) and accompanying I&D Memo at cmt. 3.

Challenging this determination, Kangtai argues Commerce is required, in accordance with its *Labor Methodology*, to remove the employee benefits as well as the other item(s) removed from SG&A labor, because those relate to production labor and are itemized among the SG&A of the financial statement.  Kangtai *RR2* Cmts at 21-24.  Kangtai challenges the defense as overly reliant upon *Elkay*,[11] as that case is now under appeal.  Kangtai argues it is not required to provide *additional* record evidence to show that the SG&A labor cost is overstated beyond simply pointing to the disaggregated SG&A expense items on the MVC financial statement that are already included in the ILO Chapter 6A data, and it asks that Commerce simply follow its *Labor Methodology* as published.

The court has considered the arguments on this issue and must conclude that substantial evidence of record supports Commerce's determination.  Although it may *seem*

---

[11] *See Elkay Mfg. Co. v. United States*, 38 CIT ___, 34 F. Supp. 3d 1369 (2014), *appeal filed*, *sub nom. Guangdong Dongyuan Kitchenware v. United States*, No. 16-2637 (Fed. Cir. Sep. 14, 2016).

unreasonable not to exclude the item self-described as *employee* benefits among the SG&A expenses of the MVC financial statement in accordance with Commerce's own *Labor Methodology*, at this point in time, the state of the law is such that it cannot be concluded unreasonable in fact. *Cf.*, *e.g.*, *US Magnesium LLC v. United States*, No. 2015-1864, 2016 WL 5845735, at *4 (Fed. Cir. Oct. 6, 2016) ("[g]iven that retorts are not listed as raw materials, and that retorts are grouped together with other expenses that are plainly not direct materials, it was reasonable for Commerce to conclude that the records do not show that TMI's supplier treated retorts as direct inputs").  Kangtai's argument, rather, is for substitution of its own view of the record to support such exclusion, which would not be appropriate.  *See Universal Camera, supra*, 340 U.S. at 488.

V.  By-Product Offset Calculation Methodology

As previously discussed, Commerce's normal by-product offset practice values such products as close to the split-off point as possible.  *See*, *e.g.*, *Magnesium Metal from the Russian Federation: Final Results of Antidumping Duty Administrative Review*, 76 Fed. Reg. 56396 (Sep. 13, 2011), and accompanying I&D Memo at comment 1a.  On second remand, Commerce again determined the by-product offset by reference to the value of the downstream by-product ammonium sulfate, explaining that "[t]he net value of the ammonium sulfate reflects the product closest to the split-off point that does not result in the illogical outcome when we value the ammonia gas and sulfuric acid generated at the split-off point."[12]  *RR2* at 10.

---

[12]  Commerce also confirmed that it was relying on the full amount of ammonium sulfate produced during the POR from those by products and not merely the amount of ammonium sulfate sold during the POR.  *RR* at 33.

A.

To get to that split-off point in the production of subject merchandise, Commerce deducted from the net value of the ammonium sulfate the further processing costs of the ammonia gas and sulfuric acid involved in its production.[13]  As its reasons for doing so, Commerce expressed two concerns.  The first was that "neither respondent during the [POR] could measure and keep records of the actual amount of waste ammonia gas and sulfuric acid which was being produced"[14] and that, "[a]s a result, we were forced to go to the downstream product production records to obtain the data to derive the amounts of ammonia gas and sulfuric acid." *RR2* at 9. "Therefore the first point at which the Department could determine the amount of by-product produced was from the companies' books and records on the downstream product production." *Id*.

Arch-Jiheng and Kangtai contend the foregoing is no reason for not relying on surrogate values of record to value the ammonia gas and sulphuric acid by-products in this instance because (1) the "concern" permeates the first through the fifth administrative reviews, during which time Commerce never expressed it to be problematic as such when determining the amounts of

---

[13]  In the final analysis, *per* Kangtai's previous suggestion, *see Clearon II*, Slip Op. 15-91 at 61, Commerce did not make any changes to Kangtai's by-product offset determined for the first remand results, *i.e.*, Commerce did not deduct the further processing costs from Kangtai's production of ammonium sulfate because Kangtai does not separately record the FOPS used to convert the ammonia gas and sulfuric acid into ammonium sulfate and it had allocated all the further processing costs to cyanuric acid.  *See RR2* at 10-11.

[14]  Arch-Jiheng points out that for the instant review this "finding" is factually incorrect on Jiheng's actual tracking of the actual amount of sulphuric acid it generated in the production of cyanuric acid. *See*, *e.g.*, Arch-Jiheng's Cmts on 2nd Remand Results at 11-12.

ammonia gas and sulphuric acid relevant to the by-product offset[15]; (2) Commerce routinely accepts

a by-product offset based on an estimation of the amount produced when the respondent (a) can

demonstrate that the by-product was produced in the course of producing the subject merchandise,

(b) does not maintain production records of the by-product, and (c) provides a reasonable calculation

tied to the company's production records[16]; (3) the concern is at odds with Commerce's treatment

in this same review of Jiheng's hydrogen gas and chlorine gas, because Commerce had verified

Jiheng's production records for those products and relied on Jiheng's formulas therefor in the

production of subject merchandise, and Commerce does not address why its methodological change

---

[15]   As in this instance, during those reviews the relevant offsets were made based upon chemical calculations of the amounts of ammonia gas and sulphuric acid that would have been required for the amounts of ammonium sulfate produced during the relevant review periods.

[16]   *See, e.g., Certain Corrosion-Resistant Steel Products From the PRC,* 81 Fed. Reg. 35316 (June 2, 2016) (*inter alia* final LTFV determ.) and accompanying I&D Memo at cmt 2 (although respondent did not track production of scrap, Commerce permitted an offset for scrap produced and sold, the amount of which was determined by calculating the difference between total input quantity of all major raw materials and subtracting the finished output);*Glycine from the PRC*, 80 Fed. Reg. 62027 (Oct. 15, 2015) (*inter alia* final rev. results) and accompanying I&D Memo at cmt 3 (accepting Baoding's records of sales of hydrochloric acid and ammonium chloride sales as sufficient support for production quantities for by-product offset purposes); *Drawn Stainless Steel Sinks From the PRC,* 78 Fed. Reg. 13019 (Feb. 26, 2013) (final LTFV determ.) and accompanying I&D Memo at cmt 9 (accepting calculation of scrap production for by-product offset purposes based on a ratio of total weight of stainless steel grades 301 and 304 scrap sold during the POI applied to production during the POI because the company did not track scrap production in its books); and *Steel Concrete Reinforcing Bars from Latvia,* 71 Fed. Reg. 74900 (Dec. 13, 2006) (final rev. results) (accepted respondent's claimed by-product offset calculation that was based on standards it used in the normal course of business rather than actual production).   Arch-Jiheng adds that contrary to the defendant's claim that Commerce requires respondents to provide sufficient documentation of the actual amount of by-product produced*, see* Def's Resp. to *RR2* Cmts at 36 (citing *Mid Continent Nail Corp. v. United States,* 34 CIT 498, 511 (2010)), the case cited does not reflect a position taken by the court but merely quotes Commerce's decision in *Wooden Bedroom Furniture* and does not otherwise discuss Commerce's practice as applied (the court having determined that the issue before it did not involve a by-product offset but, rather, a correction to the reported costs).

is necessary or more accurate for the valuation of the ammonia gas and sulfuric acid; and (4) arguing

that *DuPont Teijin Films China Limited v. United States*, 38 CIT ___, ___, 7 F. Supp. 3d 1338,

1347-48 (2014), stands for the proposition that a change in methodology premised on supposedly

greater accuracy must be rejected where there has been no change in relevant facts from the previous

reviews compared to the present, Arch-Jiheng contends Commerce has not indicated what change

in facts in the present case concerning the use of the formulae supported a finding that its change in

methodology would lead to greater accuracy.

　　　　　This court regards Commerce's first concern (that the record lacked "full" metered

measurements and records of ammonia gas and sulfuric acid production) not as a stand-alone reason

for surrogate valuation using the actual value of the downstream ammonium sulfate product but as

a restatement of what has always been the problem since the original investigation, and it is, by now,

well-established that an agency action is arbitrary when the agency offers insufficient reasons for

treating similar situations differently. *E.g.*, *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382

(Fed. Cir. 2001).  When an agency changes its existing "policy", *i.e.*, in the sense of a "course or

principle of action previously adopted", then at a minimum the agency must "display awareness that

it is changing position", "show that there are good reasons for the new policy", and be cognizant that

longstanding policies may have "engendered serious reliance interests that must be taken into

account." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016), quoting *FCC v. Fox

Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (this court's alteration).

　　　　　But, the presumption behind such concepts, of course, is *ceteris paribus*, and

Commerce now takes the position that it has not "changed" its methodology, averring that it has

merely "adjusted" its policy into what it describes as a form of "capping" to suit the circumstances at hand.  That position is obviously at odds with the analysis of *Clearon II*, and it is thus arguable whether Commerce has, therefore, not in fact displayed "awareness" that for purposes of the review at bar it has in fact "changed" its chosen course of action from its previous handling of the surrogate valuation of the ammonia gas and sulfuric acid (because the way in which respondents produced subject merchandise and handled the by-products thereof has not altered), or whether the only apparent circumstance of relevance to this issue for the instant review that is "different" as compared with prior reviews, as expressed as Commerce's second concern below, implies a difference of such significance, *primae impressionis*, that the forgoing administrative principles are inapplicable, to wit:

> [I]f we valued the by-products as close to the split off point as possible in this proceeding, as we had done in all prior reviews and the investigation of this case, then the amount of the by-product offset would result in an illogical outcome because the value of the ammonia gas and sulfuric acid (the immediate by-products) would be higher than the value of the ammonium sulfate (the by-product that is actually sold).[  ] In reality, . . . no company would combine two inputs, and incur additional processing costs, in order to make a lower-valued ammonium sulfate by-product. This was a clear indication that applying our methodology in the normal manner was not appropriate.

*Id*. at 9 (footnote omitted); *see also id*. at 34.

Commerce's solution has been perplexing to Arch-Jiheng and Kangtai, as this litigation has shown, and as above indicated.  Nonetheless, in accordance with the foregoing Commerce is permitted, generally speaking, to change its methodology at any time, so long as it

provides a reasonable explanation for the change.[17]   Commerce has expressed a legitimate concern (*i.e.*, reason) for doing so here.

B.

One exception changing a method or policy is when a party has relied upon a long standing methodology to its detriment.   *See Shikoku Chemicals Corp. v. United States*, 16 CIT 382, 388, 795 F. Supp. 417, 421-22 (1992) ("*Shikoku Chemicals*").   Arch-Jiheng and Kangtai maintain that Commerce's new method is impermissible, as it gave them no opportunity to "respond," and is unlawfully retroactive, as it gave them no opportunity to adjust their behavior from the existing methodology upon which they claim they had reasonably relied. Arch-Jiheng *RR2* Cmts at 4-5; Kangtai *RR2* Cmts at 26-28.

As to their first argument, the defendant contends Arch-Jiheng and Kangtai have had numerous opportunities to object to Commerce's calculation and they are not entitled to additional procedure on this issue,[18] and as to their second argument it argues "immediate application is the rule

---

[17] *E.g.*, *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 CIT 1150, 1169, 178 F. Supp. 2d 1305, 1327 (2001) (Commerce is generally "free to discard one methodology in favor of another, the better to calculate more accurate dumping margins") (citation omitted); *Cultivos Miramonte S.A. v. United States*, 21 CIT 1059, 1064, 980 F. Supp. 1268, 1274 (1997) ("Commerce has the flexibility to change its position providing that it explains the basis for its change and providing that the explanation is in accordance with law and supported by substantial evidence").

[18] Elaborating, the defendant points out that in the original proceeding the petitioners raised concerns with the inflated values for ammonia gas and sulfuric acid and proposed that Commerce use a different approach in the final results. *RR2* at 35, citing PDoc 155 at 40-41. Arch-Jiheng responded that the prior decisions cited by the petitioners were distinguishable, *see* PDoc 157 at 16-19, and Kangtai did not respond, *cf.* PDoc 159 at 35. Arch-Jiheng and Kangtai had additional opportunities to challenge Commerce's by-product offset in the first and second remands, and to the extent they raised specific arguments regarding the by-product methodology, Commerce responded to them in the second remand results. *See RR2* at 31-37.

where the new law affects only procedure or remedies."  Def's Resp. to *RR2* Cmts at 40, quoting

*Brother Industries, Ltd. v. United States*, 15 CIT 332, 337, 771 F. Supp. 374, 380 (1991) (citations

omitted).[19]  On this latter point, the defendant posits that *Shikoku Chemicals* basically relied on

typical retroactivity principles, which normally apply to "congressional enactments and

administrative rules", and it stresses that the respondents have not shown that Commerce's

methodology here had the effect of a regulation or statute or demonstrated retroactivity pursuant to

the applicable standards regarding (1) the "nature and extent of the change of the law," (2) "the

degree of connection between the operation of the new rule and a relevant past event," and (3)

"familiar considerations of fair notice, reasonable reliance, and settled expectations."  Def's Resp.

to *RR2* Cmts at 40, quoting *Princess Cruises, Inc. v. United States*, 397 F.3d 1358, 1364  (Fed. Cir.

2005) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994)).

          According to the defendant, *NTN Bearing Corp. of Am. v. United States*, 24 CIT 385,

400-01, 104 F. Supp. 2d 110, 124-25 (2000), *aff'd* 205 F.3d 1263 (Fed. Cir. 2002), is similar to this

case and limited *Shikoku* to its facts, holding *Shikoku* inapt when Commerce did not "switch to[ ]

any new methodology" when it abided an existing administrative preference as applied to the record.

*Id.*, 24 CIT at 401, 104 F. Supp. 2d at 125. The defendant contends the *NTN* plaintiff also failed to

show actual reliance on the old methodology, because it did not establish that it "had actually

adjusted its prices and, except for the change in methodology, . . . would be entitled to a revocation

of the outstanding antidumping duty order."  Def's Resp. to *RR2* Cmts at 41, quoting *id*.  Likewise

here, the defendant continues, Arch-Jiheng and Kangtai have not provided evidence of actual

---

    [19] *Cf. APEX Exp. v. United States*, 777 F.3d 1373, 1379 (Fed. Cir. 2015) (antidumping duty
proceedings involve a "trade remedy" and their "antidumping duties are special remedial duties").

reliance but have only presented a general reliance interest argument, which is conclusory and unsupported by specific citations to the record. *Id.*, referencing Kangtai *RR2* Cmts at 26-27 and Arch-Jiheng *RR2* Cmts 4-5. *See* R-PDoc 82 at 6; R-PDoc 83 at 19-20. Nor, the defendant emphasizes, have Arch-Jiheng and Kangtai shown that Commerce actually changed its methodology: "As Commerce explained, it did not alter its methodology in this review, but simply adjusted it given the specific facts in this review." *Id.*, referencing *RR2* at 8-9.[20]

Clearon supports these remand results, arguing that there is no evidence that any party relied on any particular by-product offset methodology when determining its pricing, and that the parties have commented exhaustively on this issue. Regarding Arch-Jiheng's argument that a third remand is necessary because Commerce "makes no reference to either the parties' reliance on the previous methodology or to Commerce's failure to provide notice and opportunity to comment during the underlying review", Arch-Jiheng *RR2* Cmts at 4, Clearon argues there was no reason for Commerce to discuss either allegation because no error occurred. Clearon *RR2* Resp. to Cmts at 2-3.

Kangtai and Jihang, however, argue Commerce did in fact "change" its methodology and its "views" of their bookkeeping. However, this court need not resolve that question, because the record must encompass some form of evidence from which to conclude actual reliance upon the pre-altered methodology. *See, e.g., Fischer S.A. Comercio, et al., v. United States*, 38 CIT ___, ___, Slip Op. 14-58 (May 27, 2014) at 13 (plaintiff "offers no evidence in support of its reliance argument

---

[20]   The defendant also references *Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1299-1300 (Fed. Cir. 2016), for the proposition that parties have no reliance interest in Commerce reaching the same results based on different records, however it is doubtful that the facts of that case are analogous to resolving the question of the degree to which the instant record "differs" from the prior administrative reviews with respect to the precise issue at bar.

other than its bare assertion that it relied on Commerce's past methodologies"); *Sanyo Elec. Co. v. United States*, 23 CIT 355, 366, 86 F. Supp. 2d 1232, 1243 (1999) (finding record evidence of actual reliance necessary to warrant remand under *Shikoku*'s reasoning); *Brother Industries, Ltd. v. United States*, 15 CIT 332, 339 (1991) ("in the absence of substantial evidence on the record, the Plaintiff's [had] failed to state a claim upon which relief [could] be granted"). It is not enough to simply assert reliance, but that, in essence, is what Kangtai and Jihang are arguing here.

Kangtai contends that "[t]his court is well aware, as explained in *Clearon II*, that respondents did rely on the former methodology", but that overstates the analysis of the prior decision, which only observed that Commerce had not addressed their reliance arguments. The court's examination of the record at this point does not independently reflect the type of reliance to which Kangtai alludes. Kangtai argues that it "kept its books and records in a particular way that Commerce accepted and found reliable to calculate a by-product offset", that it "did not make changes to its books and record", and further that it "actually relied on the fact that Commerce would continue to accept these records and grant the offset in the same manner in both POR 6 and POR 7", but the extent of that argument does not prove that such "reliance" was detrimental on this record.

Kangtai also argues that when Commerce "reversed course and determined to use a different methodology for the offset" it "determin[ed] Kangtai did not keep the appropriate books and records for the methodology it had consistently used prior." But Commerce did not determine that the respondents' books were not "appropriate" or insufficient for the purpose of determining whether a by-product offset could be granted, Commerce simply referred to the fact that "neither respondent during the [POR] could measure and keep records of the actual amount of waste

ammonia gas and sulfuric acid which was being produced" as the reason for having to rely on the

downstream ammonium sulfate product into which those by-products had been manufactured.

Kangtai further contends it "was unable to change its process to account for

Commerce's new decision" and that, "[i]f given the chance, Kangtai would have attempted to change

its books and records to account for Commerce's changed methodology", and that it "did change its

recordkeeping after this review to attempt to fit into Commerce's new requirements for the offset",

but again, such actions do not explain why Kangtai's prior recordkeeping (even assuming it had been

in reliance upon how Commerce had calculated the by-product offset from the first through the fifth

administrative reviews) was "detrimental."  In other words, given Commerce's "second" concern

above, Kangtai does not explain how or why the result here would be any different even if it had had

the chance to alter its recordkeeping to "comport" with "Commerce's new requirements for the

offset".

Kangtai also emphasizes that due to the vagaries in the surrogate value methodology,

it is not possible to know whether the ammonia and sulfuric acid surrogate values are distortedly

high or the ammonium sulfate by-product surrogate value is distortedly low, as this is an issue in the

inconsistencies of the surrogate value methodology which can change from year to year and country

to country depending on the market. "Making the surrogate value price a factor in determining the

appropriate by-product methodology is fraught with potential inconsistencies and does not allow

parties to reasonably adjust their books and records and prices to account for which way Commerce

will retroactively account for its by-product offset." Kangtai *RR2* Reply at 17.  Whether that is true

as a general matter, determinations on reliance must, of necessity, be made case by case, and the

argument is not, on this record, a reason for holding Commerce's methodological "alteration" unlawful in this instance.

Summarizing: neither Arch-Jiheng nor Kangtai point to anything of record beyond their statements of reliance on Commerce's by-product offset methodology.  There appearing to be no record evidence of actual reliance as such, neither Kangtai nor Arch-Jiheng persuades that their circumstances fall with the exception to the general rule that Commerce may change its methodologies at any time as long as it provides a reasonable explanation.  Here, it is undisputed that Jiheng and Kangtai did not sell ammonia gas or sulfuric acid[21] and did not record the actual amounts of their production but did provide for the record the actual amount of ammonium sulfate produced. *See RR2* at 9.  Kangtai originally reported its by-product as ammonium sulfate. *See* Second Remand Results at 35, citing PDoc 51, Part D at 17.  In explaining why it preferred using the downstream by-product on this record and why that preference was consistent with prior practice and did not disrupt any reliance interest by the respondents, *RR2* at 7-10, Commerce has at least expressed a reasonably legitimate concern and reasons for "altering" the way in which it valued the ammonia gas and sulfuric acid by-products on this record, whether or not that amounts to a "change" of methodology.  *Cf. National Classification Committee v. United States*, 765 F.2d 1146, 1153 (D.C. Cir. 1985) ("an agency may adopt new rules *without* affirmatively proving that the status quo is wrong") (original italics); *Center for Auto Safety v. Peck*, 751 F.2d 1336, 1349 (D.C. Cir. 1985) (it is enough for the agency to show that "there is no cause to believe that the status quo is right, so that the existing rule has no rational basis to support it").

---

[21]  *See* PDoc 49 at D-32 to D-33; PDoc 51, Sec. D, at 17.

C.

Turning once again to Commerce's actual solution to valuing the ammonia gas and sulfuric acid,  Commerce points out that its solution is in fact a form of capping.  Arch-Jiheng argues Commerce's solution here is at odds with its "normal" capping practice, which is to cap the average of the surrogate values for the inputs as it did in cases such as *Multilayered Wood Flooring*[22] and Commere has stated that such behavior is its "practice."[23]   The defendant responds that by advocating for Commerce to apply a capping methodology, Arch-Jiheng "concedes" that the values for ammonia gas and sulfuric acid were too high, and that Arch-Jiheng's cited cases "do not support a rigid capping method, but instead confirm that Commerce calculates the offset based on the record at hand." Def. 2nd Remand Response at 37.  Arch-Jiheng replies that in none of the cases cited did Commerce deduct the FOPs from a downstream product to "cap" the value of the by-product offset. "[O]n the choice of 'capping methodology' as Commerce now calls its complete change in

---

[22] *Multilayered Wood Flooring From the PRC*, 76 Fed. Reg. 64318 (Oct. 18, 2011) (final LTFV det.) ("we have valued Layo Wood's byproducts using the simple average of the surrogate values for Layo Wood's wood veneer and wood core inputs").

[23] *See, e.g., Chlorinated Isocyanurates From the PRC,* 81 Fed. Reg. 1167 (Jan. 11, 2016) (final rev. results) and accompanying I&D Memo at cmt. 3 (capping the value of hydrogen by-product by the average of its input values and citing Commerce's "practice" to this effect); *Glycine from the PRC*, *supra*, 80 Fed. Reg. 62027 and accompanying I&D Memo at cmt 3 (did not cap hydrochloric acid because surrogate value was lower than the surrogate values for the inputs but capped the ammonium chloride surrogate value at the average of the inputs); *Certain Pneumatic Off-the-Road Tires from the PRC,* 80 Fed. Reg. 20917 (Apr. 15, 2015) (final rev. results) and accompanying I&D Memo at cmt. 21 (capping the value of coal by-products to the value of the coal input surrogate values).  *See also Tapered Roller Bearings & Parts Thereof, Finished and Unfinished, From the PRC*, 74 Fed. Reg. 3987 ( Jan. 22, 2009) (final rev. results), and accompanying I&D Memo at cmt. 5 (did not use a surrogate value for the by-product that was higher than the cost of the finished good); *Certain Steel Nails from the PRC*, 73 Fed. Reg. 33977 (June 16, 2008) (final LTFV det.), and accompanying I&D Memo at cmt. 12 (did not use a surrogate value for the by-product that was higher than the cost of the finished good).

methodology, Commerce also has failed to provide a rational connection between the facts found and the choices made."  Arch-Jiheng *RR2* Reply at 10.  Kangtai raises similar argumentation.

Given surrogate values of record for ammonia gas and sulfuric acid that were higher than the downstream ammonium sulfate product into which those by-products were further-manufactured, however, for Commerce to theorize that the by-product offset for the ammonia gas and sulfuric acid by-products may be calculated based on the surrogate value of ammonium sulfate production less the further costs necessary for its manufacture is not an unreasonable solution to the problem Commerce identified.  It is also, as Commerce explains, a form of "capping" in fact, albeit not the one pressed by the parties, and the defendant emphasizes that Commerce's solution is based on the actual, not hypothetical, record of production and sales.  The court cannot substitute its own view of the record, *see Universal Camera*, *supra*, 340 U.S. at 488, but even if Commerce were to have considered using the surrogate values that directly pertain to ammonia gas and sulfuric acid on the record, it would still have been faced with having to consider "capping" or adjusting those values in a manner similar to the results reached here.

Substantial evidence of record supports Commerce's determination on this issue.  In passing, briefly addressed here is Arch-Jiheng's argument that Commerce incorrectly calculated the FOPs for producing ammonium sulfate (*see* Arch-Jiheng *RR2* Cmts at 7-10): Apart from whether or not exhaustion is an issue, *see* Arch-Jiheng's Reply to 2nd Remand Cmts at 11-12, the court declines to order a third remand for correction of ministerial error for the reasons given in Commerce's Second Remand Results and as articulated in the defendant's brief.  *See RR2* at 37; Def's Resp. to *RR2* Cmts at 38-39.  *Cf.*, *e.g.*, *Dorbest Ltd. v. United States*, 32 CIT 185, 217 (2008)

("cases cited by [the plaintiff] do not go so far as to require that Commerce must correct late-raised ministerial errors").

*Conclusion*

For the above reasons, judgment will be entered sustaining Commerce's second results of remand.


                                        /s/  R. Kenton Musgrave            
Dated:  November 23, 2016               R. Kenton Musgrave, Senior Judge
         New York, New York